[Cite as *State v. Norfleet*, 2017-Ohio-1189.]

COURT OF APPEALS
COSHOCTON COUNTY, OHIO
FIFTH APPELLATE DISTRICT


| | | |
|---|---|---|
| STATE OF OHIO | : | JUDGES: |
| | : | Hon. W. Scott Gwin, P.J. |
| Plaintiff-Appellee | : | Hon. Craig R. Baldwin, J. |
| | : | Hon. Earle E. Wise, Jr., J. |
| -vs- | : | |
| | : | |
| WILLIE NORFLEET, JR. | : | Case No. 2016CA0011 |
| | : | |
| Defendant-Appellant | : | O P I N I O N |


CHARACTER OF PROCEEDING:      Appeal from the Court of Common
Pleas, Case No. 16CR0017


JUDGMENT:      Affirmed


DATE OF JUDGMENT:      March 30, 2017


APPEARANCES:

For Plaintiff-Appellee            For Defendant-Appellant

JASON W. GIVEN                DAN GUINN
318 Chestnut Street           P.O. Box 804
Coshocton, OH 43812        New Philadelphia, OH 44663

*Wise, Earle, J.*

{¶ 1} Defendant-Appellant, Willie Norfleet, Jr., appeals his July 18, 2016 conviction and sentence of the Court of Common Pleas of Coshocton County, Ohio. Plaintiff-Appellee is the state of Ohio.

## FACTS AND PROCEDURAL HISTORY

{¶ 2} On February 29, 2015, the Coshocton County Grand Jury indicted appellant on one count of aggravated burglary with a firearm specification in violation of R.C. 2911.11 and 2941.141, four counts of kidnapping in violation of RC. 2905.01, one count of carrying a concealed weapon in violation of R.C. 2923.12, one count of having a weapon while under disability in violation of R.C. 2923.13, and one count of tampering with evidence in violation of R.C. 2921.12. Said charges arose from an incident involving appellant and his two brothers, Josh and Jason, and the victims, Linda Murray, Samantha Crenshaw, Carrie Goff, and Brittany Harris, at the home of Ms. Murray on February 3, 2016.

{¶ 3} A jury trial commenced on July 12, 2016. The jury found appellant guilty of the aggravated burglary count with the firearm specification and the four counts of kidnapping, and not guilty of the remaining counts. By judgment entry filed July 18, 2016, the trial court sentenced appellant to ten years on the aggravated burglary count with an additional mandatory three years for the firearm specification, and five years on each of the kidnapping counts, to be served consecutively, for a total term of thirty-three years in prison.

{¶ 4} Appellant filed an appeal and this matter is now before this court for consideration. Assignments of error are as follows:

I

{¶ 5} "APPELLANT'S CONVICTION FOR BURGLARY AND KIDNAPPING WERE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE."

II

{¶ 6} "THE TRIAL COURT ERRED IN SENTENCING APPELLANT TO CONSECUTIVE SENTENCES AS THE COURT FAILED TO ENGAGE IN THE REQUISITE THREE PART ANALYSIS REQUIRED TO SENTENCE ONE TO CONSECUTIVE SENTENCES BY FAILING TO FIND ANY OF THE THREE FACTORS LISTED IN ORC 2929.14(C)(4)(a)-(c) APPLIED."

I

{¶ 7} In his first assignment of error, appellant claims his conviction for aggravated burglary and kidnapping were against the manifest weight of the evidence. We disagree.

{¶ 8} On review for manifest weight, a reviewing court is to examine the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine "whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Martin,* 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983). See also, *State v. Thompkins*, 78 Ohio St.3d 380, 1997-Ohio-52, 678 N.E.2d 541. The granting of a new trial "should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction." *Martin* at 175. We note the weight to be given to the evidence and the credibility of the witnesses are issues for the trier of fact. *State v. DeHass*, 10 Ohio St.2d 230, 237

N.E.2d 212 (1967). The trier of fact "has the best opportunity to view the demeanor, attitude, and credibility of each witness, something that does not translate well on the written page." *Davis v. Flickinger,* 77 Ohio St.3d 415, 418, 1997-Ohio-260, 674 N.E.2d 1159.

{¶ 9} Appellant was convicted of aggravated burglary in violation of R.C. 2911.11(A)(2) which states:

(A) No person, by force, stealth, or deception, shall trespass in an occupied structure or in a separately secured or separately occupied portion of an occupied structure, when another person other than an accomplice of the offender is present, with purpose to commit in the structure or in the separately secured or separately occupied portion of the structure any criminal offense, if any of the following apply:

(2) The offender has a deadly weapon or dangerous ordnance on or about the offender's person or under the offender's control.

{¶ 10} Appellant was also convicted of kidnapping in violation of R.C. 2905.01(A)(3) which states:

(A) No person, by force, threat, or deception, or, in the case of a victim under the age of thirteen or mentally incompetent, by any means, shall remove another from the place where the other person is found or restrain the liberty of the other person, for any of the following purposes:

(3) To terrorize, or to inflict serious physical harm on the victim or another.

{¶ 11} During the trial, each of the victims testified to the events of February 3, 2016.

{¶ 12} Brittany Harris testified on the night of the incident, she was staying at the home of Linda Murphy when there was a knock at the door. T. at 130, 135. She asked who it was and someone replied, "Josh." T. at 136. Because Ms. Harris knew a Josh, she unlocked the door and opened it "like four inches." T. at 136-137. She observed "three black guys" and did not know who they were. T. at 137. The men were later identified as appellant and his brothers, Josh and Jason Norfleet. T. at 137, 170.

{¶ 13} Ms. Harris asked the men who they were looking for. T. at 137. They did not respond, so she started to close the door because, "I didn't know who that they were there for and, I mean, they weren't supposed to be there." *Id.* She noticed Josh had a gun in the front of his pants. T. at 138. The men pushed their way into the house, and Josh held the gun to her chest and "told me to sit the fuck down and don't move." T. at 138-139. Appellant went over to Samantha Crenshaw and started yelling at her. T. at 140. Ms. Harris identified appellant in the courtroom. T. at 141. Josh was going through the rooms saying: " 'Where's that nigga at? We know he's in here. Where's he at?' " *Id.* She testified appellant had "what I thought was a black object in his hand in his pants. He didn't pull nothing out." T. at 142. She believed his hand was on the butt of a gun, but she was not 100 percent sure. T. at 142, 157, 163. She thought it was a

gun because when he was yelling at Ms. Crenshaw, he said, " 'I should just shoot you right now.' "  T. at 163.

{¶ 14} Ms. Murphy then came out of her bedroom and "points at them and tells them to get the fuck out of her house."  T. at 143.  They did not leave.  *Id.*  Josh and Jason followed Ms. Murphy into her bedroom while appellant continued to yell at Ms. Crenshaw.  T. at 144.  At some point, Josh and Jason exited Ms. Murphy's bedroom, and Josh ran over to Ms. Crenshaw, placed the gun to her head, and shot the gun.  T. at 145.  The three men then ran out of the house.  *Id.*

{¶ 15} Ms. Harris explained even though the front door was open, she thought if she tried to leave the house, her "friends' life would have been taken if I had tried to leave to save myself."  T. at 146.  Even though she was not physically restrained, tied-up or handcuffed, Ms. Harris felt restrained nonetheless because "if I would have tried to leave, we would have all got shot, or I would have got away and they would have got shot."  T. at 164.  Appellant was fifteen feet from her and she believed he had a gun.  T. at 163-164.

{¶ 16} Linda Murray testified on the evening of the incident, she was in her bedroom and heard a commotion in the living room.  T. at 173.  She walked out of her bedroom and saw the Norfleet brothers in her home.   T. at 172.  They had not been invited.  T. at 171, 186.  She knew who the Norfleet brothers were, and they had been to her house before.  T. at 170-171.  Ms. Murphy identified appellant in court.  T. at 178.  She stated she told them "to get the fuck out of my house," but they did not leave.  T. at 174, 186.  She observed all three men with a gun in their hands, and specifically saw appellant holding a gun.  T. at 174-175, 198, 200.  On cross-examination, Ms. Murphy

stated she could not remember whether appellant had a gun. T. at 196-197. On redirect, she explained she was confused on cross-examination, and acknowledged the whole incident was a traumatic event in her life. T. at 198. On recross, she stated as to the discrepancy, "[t]his is a stressful trial" and "[i]t's been a long day." T. at 200.

{¶ 17} Ms. Murphy went back into her bedroom and heard a gunshot. T. at 176. She testified she was scared to leave her bedroom because "I didn't want to be shot." T. at 177, 180. She stated she was very scared even after they left, and although she was not physically restrained, tied-up, or handcuffed, she felt restrained because "they had guns" and "I didn't want to get shot." T. at 185-186. She felt she did not have any way to leave the house since she could not walk to the door without passing someone with a gun. T. at 199.

{¶ 18} Ms. Murphy stated the incident did not last long. T. at 180. A surveillance video of Ms. Murphy's home showed the three men approaching the porch to her house and then stepping off the porch leaving her house. T. at 181, 184; Plaintiff's Exhibit 1. The front door of the home was not in view. T. at 183.

{¶ 19} Carrie Goff testified on the night in question, she was in Ms. Murphy's bedroom when she heard "a bunch of ruckus" in the living room. T. at 207. She corroborated that Ms. Murphy exited the bedroom and told the three men to leave, and after Ms. Murphy reentered the bedroom with Josh and Jason, Josh and Jason left the bedroom and she then heard a gunshot. T. at 207-208. Ms. Goff stated she was scared because "they had guns," although she did not know if appellant had a gun. T. at 211, 219-220. Even though she was not physically restrained or tied up, Ms. Goff felt that she could not move without suffering consequences. T. at 211. She did not "think

it was smart to leave with someone with a gun." *Id.* She thought the whole incident lasted about fifteen minutes. T. at 214.

{¶ 20} Samantha Crenshaw stated on the evening of the incident, she was asleep on an air mattress by the front door. T. at 229. She remembered the three brothers coming through the door and appellant yelling at her as his two brothers searched the house for someone. T. at 229-230. Appellant was threatening in a mean voice to beat her ass and knock her teeth out. T. at 230-231. Although Ms. Crenshaw did not observe appellant holding a gun, she saw his hand in his pants "[l]ike he was holding his gun or something." T. at 231-232. After Josh and Jason exited Ms. Murphy's bedroom, Josh pulled the covers off of Ms. Crenshaw and shot the gun a "couple inches" close to her head. T. at 234. She stated she felt she was not free to leave the house because "there was three men there" and it was scary. T. at 236, 238-239. Although she was not physically restrained, tied up, or handcuffed, Ms. Crenshaw felt restrained because "all them guys there" with guns. T. at 240.

{¶ 21} Ms. Crenshaw corroborated Ms. Harris's testimony about the men entering the house and one of them pointing a gun to her chest and ordering her to sit down and stay there. T. at 236. Ms. Crenshaw thought the whole incident lasted fifteen to twenty minutes. T. at 238.

{¶ 22} Coshocton County Sheriff's Deputy Ernie Snyder arrested the three men at a Circle K after being informed they were "suspects in a home invasion and a possible shooting." T. at 262, 264. Deputy Snyder did not find any weapons on the men or in the vehicle. T. at 264-265, 271.

{¶ 23} Coshocton County Sheriff's Detective Garrison Bryant arrived at Ms. Murphy's house and found a shell casing in the living room. T. at 275, 281; State's Exhibit 7. It was the same brand and caliber as a bullet found in the vehicle the men were in when they were arrested at the Circle K. T. at 291-292; Plaintiff's Exhibits 19 and 20. He also discovered a bullet hole in the pillow and air mattress Ms. Crenshaw was using, as well as a bullet hole in the floor. T. at 283-286; State's Exhibits 8-13. Detective Bryant reviewed the surveillance video and noted the time on the video when the three men were on the porch of Ms. Murphy's home was 9:48 p.m., and 9:50 p.m. when they were stepping off the porch and leaving the house. T. at 319-320; Plaintiff's Exhibit 1.

{¶ 24} Appellant challenges the credibility of the victims because they were admitted drug users, but they testified they were not under the influence of drugs at the time of the incident. Appellant's Brief at 12. As for any discrepancies in the various testimonies, as noted above, the jury, as the trier of fact, was in the best position to determine the credibility of the witnesses. *Dehass*; *Davis.*

{¶ 25} Upon review, we cannot say that the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be overturned and a new trial ordered.

{¶ 26} Assignment of Error I is denied.

II

{¶ 27} In his second assignment of error, appellant claims the trial court erred in sentencing him to consecutive sentences in violation of R.C. 2929.14(C)(a)-(c). We disagree.

{¶ 28} R.C. 2953.08 governs appeals based on felony sentencing guidelines. Subsection (G)(2) sets forth this court's standard of review as follows:

(2) The court hearing an appeal under division (A), (B), or (C) of this section shall review the record, including the findings underlying the sentence or modification given by the sentencing court.

The appellate court may increase, reduce, or otherwise modify a sentence that is appealed under this section or may vacate the sentence and remand the matter to the sentencing court for resentencing. The appellate court's standard for review is not whether the sentencing court abused its discretion. The appellate court may take any action authorized by this division if it clearly and convincingly finds either of the following:

(a) That the record does not support the sentencing court's findings under division (B) or (D) of section 2929.13, division (B)(2)(e) or (C)(4) of section 2929.14, or division (I) of section 2929.20 of the Revised Code, whichever, if any, is relevant;

(b) That the sentence is otherwise contrary to law.

{¶ 29} "Clear and convincing evidence is that measure or degree of proof which is more than a mere 'preponderance of the evidence,' but not to the extent of such certainty as is required 'beyond a reasonable doubt' in criminal cases, and which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought

to be established."   *Cross v. Ledford,* 161 Ohio St. 469, 120 N.E.2d 118 (1954), paragraph three of the syllabus.

{¶ 30} R.C. 2929.14(C)(4) governs consecutive sentences and states the following:

(4) If multiple prison terms are imposed on an offender for convictions of multiple offenses, the court may require the offender to serve the prison terms consecutively if the court finds that the consecutive service is necessary to protect the public from future crime or to punish the offender and that consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public, and if the court also finds any of the following:

(a) The offender committed one or more of the multiple offenses while the offender was awaiting trial or sentencing, was under a sanction imposed pursuant to section 2929.16, 2929.17, or 2929.18 of the Revised Code, or was under post-release control for a prior offense.

(b) At least two of the multiple offenses were committed as part of one or more courses of conduct, and the harm caused by two or more of the multiple offenses so committed was so great or unusual that no single prison term for any of the offenses committed as part of any of the courses of conduct adequately reflects the seriousness of the offender's conduct.

(c) The offender's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the offender.

{¶ 31} In its July 18, 2016 judgment entry on sentencing, the trial court stated the following:

In imposing consecutive sentences, the Court finds that consecutive sentences are necessary to protect the public from future crime, to punish the offender and that consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public, and the offender's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the offender. In making its finding regarding Defendant's history of criminal conduct, the Court notes that Defendant had five prior felony convictions including vehicular assault, aggravated assault, robbery and 4 PRC violations.

{¶ 32} During sentencing, the trial court recited these findings, and noted appellant's lengthy criminal history: receiving stolen property, three counts of corrupting a minor with drugs, robbery, four postrelease control violations, vehicular assault, and aggravated assault. T. at 431-433, 436-437. Based on appellant's criminal history, the trial court stated, "I see a very, very dangerous person." T. at 434.

{¶ 33} Upon review, we find the trial court properly considered the mandates of R.C. 2929.14(C)(4) and did not err in imposing consecutive sentences.

{¶ 34} Assignment of Error II is denied.

{¶ 35} The judgment of the Court of Common Pleas of Coshocton County, Ohio is hereby affirmed.

By Wise, Earle, J.

Gwin, P.J. and

Baldwin, J. concur.


EEW/sg 323